# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                    Case No. 0:19-cr-00061-ECT-KMM

      Plaintiff,

v.

                                                  **REPORT AND**
1. Alba Haydee Alatorre;                                    **RECOMMENDATION**
2. Edgar Manuel Sierra-Serrano; and
3. Dorian Jossier Castillo;

      Defendants.

Alba Alatorre, Edgar Sierra-Serrano, and Dorian Castillo are charged with conspiring to distribute methamphetamine. (Indictment, ECF No. 15.) This matter is before the Court for a report and recommendation on the defendants' motions to suppress evidence the government obtained as a result of a February 17, 2019 search of an automobile being transported from California to Minnesota on a car hauler. (Alatorre Mot., ECF No. 56; Sierra-Serrano Mot., ECF No. 65; Castillo Mot., ECF No. 47.) Mr. Sierra-Serrano also seeks suppression of evidence obtained pursuant to a February 19, 2019 Hennepin County search warrant. (Sierra-Serrano Mot., ECF No. 65; Sierra-Serrano Mem. at 28–45, ECF No. 81; Gov't Ex. 5.) Finally, Mr. Castillo moved to suppress evidence obtained pursuant to a search warrant issued by this Court.[1] (Castillo Mot.) For the reasons that follow, the Court recommends that the defendants' motions be denied.

---

[1]      At the motions hearing, the Court discussed referring review of that search warrant to another magistrate judge for a report and recommendation. (Gov't Ex. 6; Tr. of Apr. 24, 2019 Mots. Hr'g ("Tr.") 109:11–23, ECF. No. 80.) However, as explained below, the Court finds that such a referral is unnecessary and concludes that Mr. Castillo's suppression motion should be denied to the extent it challenges the search warrant.

## I.    Background

On February 17, 2019, Kansas Highway Patrol Trooper Cody Parr inspected a commercial car hauler in rural Kansas. During the inspection, Trooper Parr observed several suspicious details about a Ford Explorer Sport Trac ("the Sport Trac") that was being transported on the car hauler's trailer. The ensuing investigation, discussed below, led to the discovery of a significant amount of methamphetamine concealed inside the Sport Trac, the arrest of the defendants, and the seizure of additional evidence, including mobile devices.

### CVSA Inspection of the Car Hauler

As a Kansas Highway Patrol officer, Trooper Parr investigates the use of roadways for trafficking stolen property, human trafficking, drug trafficking, and other illegal activity. (Tr. of Apr. 24, 2019 Mots. Hr'g ("Tr.") 26:6–25, ECF. No. 80.) In addition to these criminal interdiction responsibilities, Trooper Parr also conducts Commercial Vehicle Safety Alliance ("CVSA") inspections for commercial motor vehicles pursuant to regulations passed by the federal government. (Tr. 26:14–25, 27:18–28:1.) There are three levels of CVSA inspections.[2] Trooper Parr is certified to conduct "level two" inspections, which include a visual walk-around inspection, examining the tires, wheels, studs, lighting, and load securement to ensure compliance with regulations. (*See* Tr. 28:2–10.) CVSA inspections also involve examining paperwork, such as logbooks, permits, driver's licenses, and similar matters. (Tr. 28:11–13.)

Around 10:00 a.m. on February 17, 2019, Trooper Parr spotted a semi-truck car hauler with a flat-bed trailer loaded with three vehicles. The car hauler was parked in the small town of Kismet, Kansas. (Tr. 27:11–17, 28:14–20.) Trooper Parr thought that the trailer appeared to be

---

[2]    The level-three inspection involves examining paperwork and the level-two inspection involves a walk-around. (Tr. 55:13–56:5.) There was no evidence received regarding level-one inspections.

very old, which may give rise to the concerns addressed in CVSA inspections. (Tr. 28:21–29:2.) He thought it would be good to inspect the car hauler if he spotted it on the road later that day. (Tr. 29:3–4.) Around noon, Trooper Parr was on patrol along U.S. Highway 54, near the small town of Blaine, when he saw the car hauler and pulled it over to conduct a CVSA inspection. (Tr. 26:6–11, 27:9–14, 28:5–8, 29:5–14.)

Trooper Parr confirmed that the driver, "V.C.," was properly licensed, checked his paperwork, and walked around the trailer to see how its three vehicles were secured. (Tr. 29:15–25.) One of the three vehicles being transported was a 2004 Ford Explorer Sport Trac. (Tr. 30:1–3; Gov't Ex. 2.) As Trooper Parr's inspection continued, he became suspicious about whether the Sport Trac was connected to illegal activity.

### *Registration and License Plate Information*

As part of the inspection process, Trooper Parr ran the registration information for all three vehicles on the trailer through his squad car's computer system. (Tr. 31:18–21.) The Sport Trac had a California license plate, and Trooper Parr reviewed California registration records, which showed that the Sport Trac was registered to an individual identified as Arturo Lujan between May 31, 2018 and May 31, 2019. The vehicle had been sold ten days after it was registered. (Tr. 31:22–32:18.) Ms. Alatorre was listed as the buyer of the Sport Trac on June 10, 2018, and the records listed a sale price of $2,000. (Tr. 32:23–33:7.) Ms. Alatorre did not register the Sport Trac in her own name after the purchase. (Tr. 33:8–10, 57:25–58:2.)

Trooper Parr also reviewed information regarding the Sport Trac's license plate numbers and border-crossings, which led him to suspect it may have been used for drug trafficking activity. Trooper Parr noticed that the Sport Trac currently had a license plate with the number 52804W1 (the "528 plate"). (Tr. 32:20–22.) The California registration records indicated that on

January 18, 2017, the Sport Trac had a license plate with the number 8P86307 (the "8P8 plate").
(Tr. 33:11–15.) Trooper Parr found it unusual that in 2017, the vehicle had the 8P8 plate, but it
had the 528 plate two years later, odd because California plates with a higher first number are
generally newer. (Tr. 33:16–34:4.) Trooper Parr found this to be consistent with his training
regarding the switching of plates between vehicles to evade law enforcement. He explained his
understanding that drug traffickers crossing the U.S.-Mexico border change plates to evade
license plate readers as they enter the United States. (Tr. 34:5–10.)

Trooper Parr also found it suspicious that on June 1, 2018, the day after the records
showed the Sport Trac was registered to Mr. Lujan, they also indicated that the 528 plate entered
the United States from Mexico. (Tr. 34:19–35:11.) However, there was no outbound record
showing that the vehicle crossed the border from the United States into Mexico with the
528 plate attached. The absence of outbound-crossing data led Trooper Parr to believe it was
possible the 528 plate had been attached to the vehicle in Mexico. (Tr. 35:4–11, 80:7–12, 86:18–
89:9.) Trooper Parr explained that in 2017, while training with border patrol at San Ysidro Port
of Entry in California, he learned that it was common for a vehicle to leave the United States
with one plate number and then return with a different plate number, and that this was done in an
effort to conceal how many times the vehicle crossed the border. (Tr. 35:12–21.) Such an attempt
to avoid detection by law enforcement is connected to the importation of illegal drugs into the
United States. (Tr. 35:22–36:3.) According to Trooper Parr, drug traffickers "will take vehicles
into Mexico and have ... post manufactured compartments installed into them ... and they will
bring the vehicle back and use it [repeatedly] for smuggling." (Tr. 36:9–17.)

### *Additional Observations*

Observations Trooper Parr made about the interior and the exterior of the vehicle increased his suspicion that the vehicle may be involved with drug trafficking. From outside the Sport Trac, he saw three air fresheners hanging from the gear shift, one hanging from the rearview mirror, and another potent deodorizer in the center console below the stereo. (*See* Tr. 36:18–37:2.) According to Trooper Parr, it is common for drug smugglers to use air fresheners as masking agents to hide the odor of illegal drugs. (Tr. 37:3–6.)

He also observed that the exterior of the vehicle appeared to be in poor shape, with several scratches and dents. (Tr. 37:7–10.) Trooper Parr found it odd that someone would pay to ship a vehicle in such a condition across the country, so he attempted to get an estimate of the value of the Sport Trac by checking Kelly Blue Book ("KBB") values on his mobile data unit. (Tr. 37:11–23.) He estimated the mileage on the vehicle and entered other details on the KBB website, which indicated that the Sport Trac was worth around $1,200 or $1,300. (Tr. 37:24–38:6.) Although he recalled entering the condition of the vehicle as "fair," the lowest quality-rating option on KBB, Trooper Parr did not remember the other specific information about the Sport Trac that he entered on the KBB website—e.g., the exact mileage, whether it was a private party or dealer, or any trade-in value.[3] (Tr. 59:11–60:12.) Still, because the Sport Trac is a common vehicle model and is not generally a collector's item, "it didn't make much sense to [Trooper Parr] to transport a 16-year-old vehicle approximately 2,000 miles for $1,000, which is what [V.C.] told [Trooper Parr] he was charging [for the shipment]." (Tr. 38:9–16.)

---

[3]     Depending on the options and other information selected on the KBB website, the value of a 2004 Ford Explorer Sport Trac may be higher than Trooper Parr's estimate. (Tr. 94:14–100:17 (testimony of private investigator William O'Keefe).) This reality does not undermine the Court's assessment of Trooper Parr's testimony as credible.

Trooper Parr also examined the bill of lading for the Sport Trac, which further confirmed his suspicions. (Tr. 38:17–23; Gov't Ex. 1.) Although the bill of lading was signed with the full name "Ana Garcia,"[4] only the first name "Ana" appeared in an area for entering the name of the person shipping the vehicle. Trooper Parr found this unusual because people shipping something valuable across country ordinarily put their first and last name on a bill of lading. (Tr. 39:1–5.) Trooper Parr also noticed that the shipping and receiving parties had the same name and phone number with a 612 area code, suggesting that "Ana" must be from Minnesota. He thought it was "nonsensical to think somebody would drive or fly 2,000 miles to purchase a 16-year-old high mileage vehicle in poor condition and spend $1,000 to ship it cross-country." (Tr. 39:6–13.) Trooper Parr also noted that no one named "Ana" was listed as a previous owner or new purchaser of the Sport Trac. (Tr. 39:14–15.) In Trooper Parr's training and experience, it is "very common" for "car haulers that are transporting vehicles that are loaded with illegal contraband that they will generally pick a very poor quality vehicle to hide their illegal contraband in to have it shipped cross-country." (Tr. 40:4–12.)

Other details specific to the Sport Trac model were concerning for Trooper Parr.

Sport Tracs are infamous for their floor compartment access and also the back wall. When Ford manufactured these, it's just part of the model itself. There is a large void underneath the rear floor and also in the back wall, and so what I learned not only in the classroom but down at the border with the customs agents is that they will either take the backseat out or fold the backseat down, cut a rectangular hole into the sheet metal

And then there is this natural void in there that they can package and plant many, many kilos, many pounds of whatever they want to and then just re-affix with a metal panel that they took out.

(Tr. 40:16–41:2.)

---

[4]    Trooper Parr noted that "Ana Garcia" was not included on any registration records for the Sport Trac. (Tr. 39:16–21.)

### *Consent from V.C. and Tire Testing*

Based on everything Trooper Parr observed, he told V.C. that he believed there was illegal contraband in the Sport Trac and asked for consent to search the vehicle. (Tr. 41:3–12.) V.C. consented to the search without hesitation, though Trooper Parr did not have him sign a consent form or obtain an audio or video recording of V.C.'s agreement. (Tr. 41:13–24, 82:10–24.) Trooper Parr testified that if V.C. had not agreed to let him search the Sport Trac, he would have detained the car hauler to bring a canine unit to sniff the vehicle. He believed he had reasonable suspicion at that point that the Sport Trac was connected to drug trafficking. (Tr. 42:25–43:5.)

Having received consent from V.C., Trooper Parr first performed an "echo test" on all five tires, the four on the Sport Trac's wheels and the spare tire attached underneath the vehicle. (Tr. 43:6–8, 43:18–22.) This test involves striking the tire with a stick or a rod close to a location where the officer listens with a stethoscope. (Tr. 43:10–14.) An empty tire returns "an echo sound like a ringing inside" whereas a tire loaded with something returns "a thud." (Tr. 43:15–17.) The echo test is performed outside the vehicle. (Tr. 43:23–25.) When Trooper Parr checked the spare tire underneath the Sport Trac, he heard a thud indicating it was loaded. (Tr. 43:18–22.)

Typically, Trooper Parr also examines tires using a density meter, which provides an electronic reading indicating whether a tire is loaded with a foreign material. (Tr. 44:6–10.) Trooper Parr used a density meter on the spare tire under the truck where he heard the thud. However, the reading he received was even lower than one would expect from an empty tire. This led Trooper Parr to conclude that the density meter was not working properly. (Tr. 44:11–24.) He obtained a new density meter soon after this investigation. Trooper Parr did not mention

the results of the density-meter test in the report about the stop and search of the Sport Trac.[5] (Tr. 62:20–22, 73:13–15.)

### *Examining the Interior*

Next, Trooper Parr unlocked the driver's side door using the key that V.C. provided. (Tr. 42:7–18, 66:13–16.)[6] Trooper Parr began by looking around the inside of the vehicle. (Tr. 44:25–45:2.) With the door open, he noticed that the door panels were all very loose, like "they had been off frequently, several times." (Tr. 45:5–7.) The center console was loose and missing screws, looking as though "it had been removed and re-affixed several times." (Tr. 45:7–9.) In the pouch behind the driver's chair, there was a set of needle nose pliers, an Allen wrench set, and a 13-millimeter wrench. (Tr. 45:11–15.) The pouch behind the seat was not mesh or some other see-through material, so Trooper Parr had to reach into the pouch to see what was in it. (Tr. 67:1–14.) He also looked in the glove box and any other compartment he could open and inspect. (Tr. 67:15–22.)

---

[5]    In preparing for the evidentiary hearing in this case, Trooper Parr erroneously informed the government that the density meter had registered a value that indicated the presence of foreign materials inside the spare tire of the Sport Trac. However, he later realized that he had mixed up the results of the test he ran in this case with readings he received from a newer density meter that he used in a subsequent methamphetamine investigation. (*See* Tr. 62:12–66:8, 71:18–76:13 (discussing the circumstances of Trooper Parr leaving information out of his report).)

[6]    Trooper Parr testified that he found it suspicious that the key for the Sport Trac was attached to a Virgin Mary key chain. He found this significant because "drug smuggling organizations that are cartel related have beliefs in a few patron saints such as the Virgin Mary [and] Jesus Malverde [and] [b]y affixing these emblems, it will protect them from law enforcement." (Tr. 42:10–17.) On cross-examination, Trooper Parr admitted that he does not think the Virgin Mary "is actually a patron saint" of drug smuggling. (Tr. 82:1–6.) While Jesus Malverde is considered to be a patron saint of drug smugglers, millions of Catholics throughout the United States would be surprised to learn that having an icon of the Virgin Mary created reasonable suspicion they are engaged in drug trafficking. The Court puts little weight into this aspect of Trooper Parr's testimony.

Trooper Parr noticed that the back seat had been altered so that it could not be folded forward. This meant that he could not look behind the rear seat to see if there were any manufactured compartments where they would most commonly be created on a Sport Trac. (Tr. 45:16–24.) Trooper Parr climbed into the back seat and shined his flashlight behind it. From there he could see loose plastic, suggesting that "it had been messed with several times and probably removed." (Tr. 45:25–46:3.) The bolts mounting the rear seat to the vehicle were shiny, indicating they too had been removed several times. One bolt appeared to have a fluid like WD-40 on it. (Tr. 46:4–7.) At this point, Trooper Parr believed there was illegal contraband in the spare tire and underneath the back seat. (Tr. 46:8–11.)

Trooper Parr used the key to turn the vehicle over and check the mileage. He noted that the Sport Trac's odometer indicated over 181,700 miles. (Tr. 46:12–23.) This confirmed his suspicions that the Sport Trac was a high-mileage vehicle with a low value. (Tr. 46:25–47:3.)

### Moving the Sport Trac for a Canine Sniff

After visually inspecting the interior, Trooper Parr decided to speak with V.C. again. (Tr. 47:4–13.) He asked V.C. "if he would drive down a few towns where I have a canine available and can run the canine around the vehicle ... to further my probable cause." (Tr. 47:4–16.) V.C. was cooperative and offered to do what he could to help with the investigation. (Tr. 47:17–22.)

V.C. hauled the Sport Trac to the town of Bucklin to arrange for the canine to sniff the vehicle. (Tr. 48:12–14.) In Bucklin, Trooper Parr met up with Ryan Davis, a Deputy with the Ford County Sheriff's Office, who was the handler for a drug detection dog named "Diego." (Tr. 48:15–22.) Trooper Parr understood Diego to be authorized for use in drug investigations. (Tr. 48:23–49:4.) While the Sport Trac was still on the trailer, Deputy Davis ran Diego around

9

the outside of the vehicle and told Trooper Parr there had been a positive alert for narcotics. (Tr. 49:7–9.) Trooper Parr then asked V.C. to drive the Sport Trac off the trailer so they could get "another external sniff." (Tr. 49:21–24.) Again, V.C. was cooperative, and once the Sport Trac was off the trailer, Diego again sniffed the exterior of the vehicle. Trooper Parr saw Diego indicate at the rear of the Sport Trac near the spare tire and at the rear cab of the truck where Trooper Parr suspected drugs were stored behind the back seat. (Tr. 49:25–50:4.) Diego essentially alerted to the two places where Trooper Parr suspected drugs were being stored in the vehicle. (Tr. 50:11–23.)

Trooper Parr later learned that Diego was trained and authorized by the Ford County Sheriff's Department, but that he had not yet been certified by a national organization. (Tr. 50:24–51:6.) The drug sniff of the Sport Trac was Diego's first active field deployment. (Tr. 51:7–9.) Diego was not required to have a national certification under Kansas law, but later became certified by the National Narcotic Detector Dog Association. (Tr. 51:13–52:1.)

### *Discovery of Methamphetamine*

The officers took the Sport Trac to a mechanic's shop near the parking lot where the canine "sniff" took place. (Tr. 52:14–21.) Trooper Parr and other officers decided to conduct a complete search of the Sport Trac at this shop. They used the needle nose pliers that were in the Sport Trac's backseat to bend a piece of metal and pull the seat forward, revealing two compartments. (Tr. 52:22–53:3.) One compartment, which was on the floor beneath and partially behind the seat, was empty. The other compartment, in the back wall of the Sport Trac's cabin, was covered by a piece of sheet metal held in place by several screws, which the officers removed. (Tr. 53:4–8.) Inside that compartment, officers found ten packages of white crystal that were wrapped in layers of cellophane. (Tr. 53:8–11.)

The officers also lowered the spare tire and separated the tire from the rim using a tool in the mechanic's shop. (Tr. 53:12–16.) Inside the tire, they found 28 packages of white crystal inside Ziploc bags. (Tr. 53:12–16.) The 10 packages found in the back wall and the 28 from inside the spare tire field-tested positive for methamphetamine and weighed approximately 40 pounds. (Tr. 54:4–19.)

### *Subsequent Investigation*

Law enforcement agents replaced the seized contraband with simulated methamphetamine in the original hiding places in the vehicle. (Gov't Ex. 5 at 3.) The agents obtained a search warrant that allowed them to install tracking equipment on the Sport Trac that would notify officers when the vehicle and simulated methamphetamine were moved or accessed. (*Id.*) Law enforcement then prepared to continue the investigation in Minnesota.

On February 19, 2019, V.C. delivered the Sport Trac "to a parking lot adjacent to a Target retail store located at 2500 E. Lake St. in Minneapolis, Minnesota[.]" (ECF No. 71 at 2, ¶ 3 (factual stipulation).) Mr. Sierra-Serrano and Ms. Alatorre arrived at the Target parking lot in a black Dodge Avenger. Mr. Sierra-Serrano got out of the Dodge and into the Sport Trac's driver's side. Ms. Alatorre drove the Dodge and Mr. Sierra-Serrano drove the Sport Trac away from the Target "to the area of 2632 30th Ave. South in Minneapolis ...." (*Id.*) Officers conducting surveillance saw the Dodge and the Sport Trac arrive at the 30th Avenue residence and enter the building. (Gov't Ex. 5 at 3.) They saw Mr. Sierra-Serrano and Mr. Castillo come back out to the Sport Trac and "access[] a tire where the simulated sub[]stance is located and brought the tire into southern most door" of the home. (*Id.* at 3–4; Petrie Aff. ¶¶ 16–19, ECF No. 1-1.) A short time after these events, all three defendants were arrested and law enforcement officers received a search warrant signed by Hennepin County District Court Judge Bruce

Peterson for the 30th Avenue residence, the Sport Trac, and any person associated with the vehicle's delivery or possession. (Petrie Aff. ¶¶ 20; Gov't Ex. 5.) Two cellular phones were seized from the passenger compartment of the Sport Trac.

On March 18, 2019, this Court issued a search warrant based on the application and affidavit of Stanton Petrie, a Special Agent with the U.S. Drug Enforcement Administration. (Case No. 19-mj-177 (KMM).) This warrant authorized the examination of four electronic devices seized during the events of February 19, 2019 described above. Two Samsung devices and one LG device were seized from the Dodge Avenger, and an iPhone was seized from a blue Jeep Compass that was parked at the South Minneapolis residence where Mr. Sierra-Serrano drove the Sport Trac after V.C. delivered it. Agent Petrie's affidavit discusses Trooper Parr's investigation, the discovery of methamphetamine inside the Sport Trac, and the subsequent investigation that led to the defendants' arrests.

## II.   The Search of the Sport Trac in Kansas

All three defendants move to suppress the evidence obtained from inside the Sport Trac, asserting that Trooper Parr's investigation violated their Fourth Amendment rights. The government argues that none of the defendants have "standing" to raise a Fourth Amendment challenge to the search that occurred while V.C. was transporting the vehicle from California to Minnesota. Alternatively, the government argues that the defendants' Fourth Amendment claims fail on the merits because: (1) V.C. had authority to consent to the vehicle search; (2) the search that revealed the drugs was independently supported by probable cause; and (3) no warrant was required because the automobile exception applies under these circumstances. (Gov't Mem. at 1–17, ECF No. 90.) In response, the defendants argue that V.C. did not have actual or apparent authority to consent to the search, that Trooper Parr did not otherwise have probable cause to

search the interior of the vehicle, and that the automobile exception permitting a warrantless search did not apply.

The Court concludes that the searches conducted in Kansas comported with the Fourth Amendment, though it does not agree in full with the government's reasoning. The Court finds first that V.C. validly consented to Trooper Parr's initial visual search of the interior of the vehicle and the echo testing of the tires. Second, based on the totality of the circumstances, including the positive alert from Diego and all of Trooper Parr's observations, probable cause supported the more substantial intrusion at the mechanic's shop into the hidden compartments in the Sport Trac's cabin and the removal of the spare tire from its rim to examine its contents. And the Court finds that the automobile exception permitted that search to be conducted without a warrant. Accordingly, the Court recommends that the defendants' motions be denied to the extent they seek suppression of the evidence found in the Sport Trac in Kansas.

## A.  Standing

The parties' debate over standing presents unique questions with respect to each of the defendants. Ms. Alatorre, as the Spot Trac's uncontested owner, has the strongest position on standing, while Mr. Sierra-Serrano's and Mr. Castillo's claimed privacy interests are more attenuated. The question of what privacy interest a car's owner maintains in the most hidden compartments of a car that they have entrusted to a third-party shipper does not admit of the easy answer for which the government advocates. However, the Court does not resolve the specific standing issues raised for each of the defendants. Even if each of the defendants could establish a reasonable expectation of privacy in the vehicle, the Court concludes that the events in Kansas comported with the Fourth Amendment.

### B.  V.C.'s Consent and the Initial Search

The parties dispute whether V.C. had the authority to consent to Trooper Parr's search of the Sport Trac. The Court finds that V.C. had both actual and apparent authority to consent to Trooper Parr's initial visual inspection of the exterior and interior of the vehicle's cabin and to perform the echo test on the vehicle's tires.

### *Legal Standards*

The Fourth Amendment prohibits unreasonable searches and seizures and provides that law enforcement must generally obtain a search warrant based upon a showing of probable cause to conduct a search. U.S. Const., amend. IV. But not all warrantless searches are unreasonable. One exception to the warrant requirement exists when a person consents to a search of her own property or when "voluntary consent has been obtained ... from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Consistent with these principles, "a vehicle search pursuant to voluntary consent from a third party with authority over the vehicle does not violate the Fourth Amendment." *United States v. Chavez Loya*, 528 F.3d 546, 554 (8th Cir. 2008) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181, 185–86 (1990)); *United States v. Matlock*, 415 U.S. 165, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission was obtained from a third party who possessed ... [a] sufficient relationship to the ... effects sought to be inspected."). The government has the burden of showing that a third party had authority to consent to a search. *Illinois v. Rodriguez*, 497 U.S. at 181 ("The burden of establishing that common authority rests upon the State.").

14

A third party's consent to a search is valid when the third party has either "actual" or "apparent" authority:

> A third party has actual authority to consent to a search if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.... [A] third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent.

*Chavez Loya*, 528 F.3d at 554 (quoting *United States v. Andrus,* 483 F.3d 711, 716 (10th Cir. 2007)).

In the context of a car *driven* by a third party, the Eighth Circuit has found that "[t]he driver of a car has the authority to consent to a search of that vehicle. As the driver, he is the person having immediate possession of and control over the vehicle." *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993); *see also United States v. Beshore*, 961 F.2d 1380, 1382–83 (8th Cir. 1992) (finding that the defendant's girlfriend had actual authority to consent to the search of the defendant's vehicle where she had permission to use the car and had put her license plates on the vehicle). The rationale behind the actual-authority rule is that a person who has allowed someone shared access and control over a piece of property has assumed the risk that the person might permit someone else to look inside. *Frazier v. Cupp*, 394 U.S. 731, 740 (1969); *Beshore*, 961 F.2d at 1382–83 ("Beshore thus assumed the risk that Wilson would permit the vehicle to be searched.").

Whether a consenting third party has actual authority to do so is not the end of the inquiry. Even if a person lacks the legal authority to consent to a search, her apparent authority can still render a resulting search lawful. The apparent-authority test requires a court to inquire "whether the facts available would have justified a reasonable officer in the belief that [the third party] had authority over the [vehicle]." *Chavez Loya*, 528 F.3d at 554 (internal quotation marks

15

omitted; first alteration changed); *United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010)

("Apparent authority exists when the facts available to the officer at the moment ... warrant a

man of reasonable caution in the belief that the consenting party had authority over the

premises.") (internal quotation marks omitted). Where a third party has apparent authority to

give consent to a search there is no Fourth Amendment violation "because the amendment's

reasonableness requirement demands of government agents not that they always be correct, but

that they always be reasonable." *United States v. Clutter*, 674 F.3d 980, 983 (8th Cir. 2012)

(internal quotation marks omitted).

### *V.C.'s Consent Was Free and Voluntary*

For several reasons, the Court concludes that Trooper Parr's initial visual inspection of

the inside of the Sport Trac and his echo test of the tires was a reasonable search under the

Fourth Amendment based on V.C.'s consent.[7] First, the Court finds that the government has

shown V.C. freely and voluntarily consented to the search. Whether consent was voluntarily

given is judged by the totality of the circumstances, and a court asks if consent was "the product

of an essentially free and unconstrained choice by its maker ... rather than the product of duress

or coercion, express or implied." *United States v. Chaidez*, 906 F.2d 377, 380–81 (8th Cir. 1990)

(internal citations and quotation marks omitted). When Trooper Parr first asked V.C. if he could

search the vehicle, he testified that V.C. consented and expressed no hesitation "whatsoever."

(Tr. 41:19–24.) V.C. was not placed under arrest or restrained when he was asked for consent (or

at any other time during the encounter). V.C. was not surrounded or intimidated by a host of

police officers. Indeed, Trooper Parr was the only officer present at the time. That V.C. freely

---

[7]     The Court explores the subsequent and more significant intrusions into the hidden
compartments and in removing the spare tire from the rim separately below.

and voluntarily consented to that initial search is further illustrated by his subsequent cooperation as well. Later in the February 17th encounter, when Trooper Parr asked V.C. if he would agree to haul the vehicle to a nearby town for a canine sniff, Trooper Parr said that V.C. again agreed and was "very cooperative" and said he "will do whatever thing he can to help out." (Tr. 47:20–22.)

### *Actual Authority*

Second, based on several factors, the Court finds that V.C. had actual authority to consent to Trooper Parr's visual inspection of the interior of the Sport Trac and his testing of the tires because V.C. had sufficient control over the vehicle to allow such an examination. The evidence shows that the customer who hired V.C. (Ms. Alatorre) gave him a key to the Sport Trac. Trooper Parr's uncontroverted testimony also shows that a commercial car carrier like V.C. has the authority to drive customers' cars on and off the trailer in the course of his work. (Tr. 42:19–24.) In addition, V.C.'s responsibility to secure the Sport Trac to the trailer and move the vehicle on and off the car hauler shows a significant degree of access and control.

The defendants argue that the bill of lading demonstrates V.C. lacked actual authority to consent to even a limited search of the interior of the vehicle because it did not expressly provide for such authority and only gave V.C. permission to access the Sport Trac in narrow circumstances.[8] Although the bill of lading does not give V.C. an unlimited right to use the vehicle for his own purposes, it nevertheless supports a finding that V.C. had a sufficient connection to the Sport Trac to have actual authority to consent to allowing another person access to the interior of the vehicle. For example, nothing in the bill of lading, which represents

---

[8]    Alatorre Mem. at 7 (discussing V.C.'s permission to silence the alarm and store the vehicle pending payment); Sierra-Serrano Mem. at 17 (discussing provisions that disclaim certain responsibilities or liabilities); Castillo Mem. at 7.

the "only contract between [V.C. and the customer],"[9] limits V.C.'s access to the interior of the vehicle. This indicates that the customer made no explicit attempt in the agreement to keep the interior of the vehicle private.[10] Further, the terms and conditions of the contract provide that if the vehicle had a car alarm system and the alarm sounded, V.C. was authorized to disable any alarm by any means he "deem[ed] reasonable and effective." (Gov't Ex. 1 at 2 ¶ 8.) The contract therefore would permit V.C. to allow a third-party to enter the vehicle to disable the alarm, even using intrusive means to do so.

Combined, all of these facts indicate that V.C.'s customer assumed the risk that V.C. could allow someone else to look in the vehicle's interior or to examine its exterior.

### *Apparent Authority*

Third, even if Trooper Parr was mistaken that V.C.'s possession and control of the Sport Trac gave him actual authority to consent to his initial search, the Court finds that V.C. had apparent authority to give such consent. The facts available would have justified the belief of a reasonable officer in Trooper Parr's position that V.C. could consent to the testing of the tires and the entry into and search of the Sport Trac's interior cabin. At the time V.C. agreed to the search, Trooper Parr knew that V.C. was in sole possession of the Sport Trac; V.C. had a key to the vehicle; and V.C. could drive the vehicle on and off the trailer. Moreover, Trooper Parr had reviewed the bill of lading, which did not expressly limit V.C.'s access to the interior of the vehicle. Aware of these facts, a "person of reasonable caution [could be justified] in the belief

---

[9]      Gov't Ex. 1 at 2 ¶ 18.

[10]      *See* 4 Wayne R. LaFave, Search &  Seizure: A Treatise on the Fourth Amendment, *Consent by bailee*, § 8.6(a) (5th ed., Oct. 2018 Update) ("Of obvious importance in making the assumption-of-risk analysis is the extent to which the bailor made efforts to secure, even as against the bailee, the privacy of his effects.").

that [V.C.] had authority over the item to be searched[.]" *United States v. James*, 353 F.3d 606,

615 (8th Cir. 2003) (citing *Rodriguez*, 497 U.S. at 188).

### Limits of Authority

However, V.C.'s authority—both actual and apparent—was not without limit. On this

record, the Court concludes that V.C.'s access to and control over the vehicle did not give him

actual authority to consent to a significantly more intrusive search into hidden compartments

within the vehicle.[11] The government cites *United States v. Morales*, 861 F.2d 396, 399 n.8 (3d

Cir. 1988), for the proposition that "[a] third party in sole possession and control of a vehicle

clearly has the authority to consent to its search." (Gov't Pre-Hr'g Resp. at 15; Gov't Mem. at 10

(referring to Pre-Hr'g Resp. for actual-authority argument).) However, *Morales* provides little

guidance for this case because it involved the validity of consent given by a non-owner who was

driving the car. The court concluded that degree of control was consistent with authority to

consent to a search of the entire car, including hidden compartments. *See* 861 F.2d at 399 ("[A]

driver has the requisite 'joint access and control' giving rise to the authority to consent to a full

search of the vehicle" including "its trunk, glove box and other compartments."). But V.C. is not

in the same position as a driver of a vehicle, and the government has not explained why the

operator of a car hauler would have a similar degree of control. Moreover, in *Morales*, the actual

lessor of the vehicle, Mr. Viera, was present during the search and did not object or limit the

---

[11]    It is unclear whether the government actually seeks to rely on V.C.'s consent to justify
the eventual dismantling search of the Sport Trac. *Compare* Gov't Mem. at 8–11 (arguing that
V.C. had actual authority to consent to the search of the Sport Trac, and that "at a minimum, the
Trooper could reasonably rely on V.C.'s apparent authority to consent to his initial inspection of
the interior"), *with* Gov't Pre-Hr'g Resp. at 16 n.2 ("[T]he Court need not decide whether V.C.'s
authority to consent extended to the search of the hidden compartments within the vehicle and
the spare tire because ... the trooper had independent probable cause before he undertook those
steps."), ECF No. 66.

scope of the search, further supporting the conclusion that the driver had authority to consent. *Id.* at 399–400. *Morales* tells us little about the actual authority exercised over a vehicle by a bailee.[12] And the reasoning of *Morales* does not explain why a person who has allowed a car hauler to move her vehicle from one state to another has assumed the risk that the operator could allow someone else to take it apart and examine every detail of its hidden intrinsic compartments. *Cf. James*, 353 F.3d at 614 ("[O]ne does not cede dominion over an item to another just by putting him in possession."); *id.* (finding that the efforts made by the defendant to demonstrate the intended privacy of an envelope containing computer discs he gave to a friend for storage did not give the friend actual authority to consent to law enforcement's opening of the package and reviewing the contents of the disc).

For many of the same reasons, the Court is not persuaded that V.C.'s apparent authority over the Sport Trac extended to the more intrusive search into hidden compartments in the vehicle that took place after Trooper Parr's subsequent investigation. Although the facts available to Trooper Parr at the time he conducted his initial search were sufficient to support a finding of apparent authority for the initial search, those same facts would not have signaled to a person of reasonable caution that V.C. could authorize another to take apart the spare tire or remove panels and metal to reveal a hidden compartment behind the back seat.[13]

---

[12]    The distinction between a third party who is a driver and a bailee who has possession of the vehicle but a lesser degree of control also undermines the government's reliance on *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993). Similarly, *United States v. Dunkley*, 911 F.2d 522 (11th Cir. 1990), also cited by the government, involved the authority of a driver to consent to a search in the presence of a person with a "stronger possessory interest in the car" who failed to object. *Id.* at 526. *Dunkley* explicitly declined to address whether the driver could consent to a search beyond the passenger compartment of the vehicle.

[13]    Trooper Parr's subsequent request for V.C. to transport the vehicle for a canine examination indicates that he understood the limits of V.C.'s authority over the Sport Trac did not extend to the entire vehicle, including hidden compartments.

Based on the foregoing, the Court concludes that V.C. freely and voluntarily consented to the initial search of the interior of the Sport Trac by Trooper Parr and his testing of its tires. Moreover, V.C. gave that consent with actual and apparent authority, and as a result, Trooper Parr's initial warrantless search of the Sport Trac did not violate the defendants' Fourth Amendment rights. However, the Court does not conclude that V.C.'s consent justified the more intrusive search that took place after the car was transported to Bucklin. Further exploration of the legality of that search is required.

### C. Events After the Initial Search

The Court considers whether the next steps in Trooper Parr's investigation violated the Fourth Amendment. The Court concludes that the subsequent search of the Sport Trac was lawful because: (1) V.C. validly consented to Trooper Parr's request to move the vehicle to Bucklin for a canine sniff; and (2) Diego's positive alert on the vehicle, combined with all the other facts known to Trooper Parr, provided probable cause to allow the warrantless search of the spare tire and hidden compartment under the automobile exception to the warrant requirement.[14]

### *Additional Consent from V.C.*

As noted above, Trooper Parr testified that after he looked inside the Sport Trac and echo-tested the spare tire, he asked V.C. if he would be willing to drive the Sport Trac on his car hauler a short distance to the town of Bucklin, Kansas, so that Trooper Parr could have the

---

[14] The parties' memoranda primarily address whether Trooper Parr's subsequent investigation was lawful *even if* his initial search of the vehicle's interior violated the Fourth Amendment. The defendants argue that arranging for a canine sniff and moving the Sport Trac to a mechanic's shop for a more intrusive search flowed from the initial violation, and the drugs that were found must be suppressed as fruit of the poisonous tree. The government argues that there was independent probable cause supporting the search that is sufficiently attenuated from any unlawful entry, so the exclusionary rule would not apply. Because the Court has found that Trooper Parr's initial search of the Sport Trac was reasonable, it does not address these fruit-of-the-poisonous-tree and attenuation arguments.

canine unit there conduct a sniff of the exterior of the vehicle. V.C. was very cooperative and agreed to bring the vehicle to Bucklin on his car hauler. The Court readily concludes that V.C. freely and voluntarily consented to drive the Sport Trac to another nearby town for a drug-detecting dog to sniff the vehicle and that it was well within his actual and apparent authority to do so, and none of the defendants have argued otherwise.

### The Automobile Exception

Mr. Sierra-Serrano argues that the automobile exception does not apply because the Sport Trac was not "readily mobile," and as a result, Trooper Parr was required to obtain a warrant before entering the vehicle to search the hidden compartment and look inside the spare tire. (Sierra-Serrano Mem. at 19–21, 22–23.) Pursuant to the automobile exception, a warrantless search of a vehicle is permissible when officers "have probable cause to believe that the car contains contraband or other evidence" of criminal activity. *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). The Supreme Court long ago recognized this exception to the warrant requirement because an automobile can be "quickly moved." *Carroll v. United States*, 267 U.S. 132, 153 (1925). Subsequent cases "recognized ready mobility as one of the principal bases of the automobile exception." *California v. Carney*, 471 U.S. 386, 390–91 (1985) (citing cases).

The mobility of the vehicle is no longer the end of the inquiry. "[A]lthough ready mobility alone was perhaps the original justification for the vehicle exception, ... later cases have made clear that ready mobility is not the only basis for the exception." *Carney*, 471 U.S. at 391. Another rationale justifying warrantless searches of vehicles is that a person has a less significant expectation of privacy in his or her automobile than in a home or office. *Id.* As a result, "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy

resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391–92 (discussing not only a plain-view analogy regarding the passenger compartment, but also cases where the lower expectations of privacy permitted entry into a locked trunk, sealed packages, and hidden compartments). This diminished expectation of privacy "derive[s] ... from the pervasive regulation of vehicles capable of traveling on the public highways." *Id.* at 392.

Following *Carney*, the Eighth Circuit has noted that both ready mobility and the reduced expectation of privacy in a vehicle justify warrantless searches under the automobile exception. *See, e.g., United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987) (applying the automobile exception to a station wagon on the defendant's property that matched the description of a vehicle witnesses had spotted near the scene of a theft). Based on these rationales, the Eighth Circuit has found a warrantless vehicle search justified under the automobile exception where a pickup truck was stuck in a ditch because it had not "lost its inherent mobility" and "could have been driven away" if it was simply towed "out of the ditch." *United States v. Maggard*, 221 F.3d 1345 (8th Cir. 2000) (per curiam) (unpublished table decision). The automobile exception also applies to parked cars, even where the officers are aware that they are unlikely to be driven away, because "[i]t is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that gives rise to the *Ross*[15] standard which allows for warrantless searches when probable cause exists." *United States v. Perry*, 925 F.2d 1077, 1080–81 & n.4 (8th Cir. 1991) (applying the exception where the vehicle was parked in a school parking lot and

---

[15]    *United States v. Ross*, 456 U.S. 798 (1982) (applying the automobile exception to permit the search of a vehicle's trunk and containers inside based on probable cause that heroin was hidden in the vehicle).

the occupants were unlikely to drive it away because they had already been arrested at the time the search was conducted).

Though neither party cites case law involving the automobile exception's application to the vehicle cargo carried on a car hauler, the Court concludes that the automobile exception applies in such circumstances. *See Perry*, 925 F.2d at 1080 n.4 (discussing the inherent mobility of automobiles). Courts following *Carney* have reasoned that application of the automobile exception does not depend on whether an automobile is required to be a "'mobile' vehicle [because] in fact the requirement is that the vehicle be 'readily mobile.'" *United States v. Wilkins*, No. 15-00232-01-CR-W-HFS, 2016 WL 2616497, at *6 (W.D. Mo. Apr. 8, 2016) (concluding that the defendant's car was readily mobile though it was parked and he had run away from it at the time of the search and focusing on the "capacity to be quickly moved" language in *Carney*). By the simple turn of an ignition key, the Sport Trac could be (and was) moved on and off V.C.'s car hauler and operated on the roadways. Indeed, the fact that Trooper Parr was able to turn the ignition over himself to check the mileage and that V.C. was able to drive the Sport Trac on and off the trailer demonstrate that the vehicle was readily mobile for purposes of the automobile exception.

Moreover, the fact that the Sport Trac was registered in California and was displaying license plates supports application of the automobile exception as well. Such facts "indicate[] it was subject to regulations that necessarily diminished any expectation of privacy in the vehicle." *United States v. Blaylock*, 535 F.3d 922, 927 (8th Cir. 2008) (concluding that automobile exception applied to a sedan parked in the driveway of a residence); *see also Carney*, 471 U.S. at 393 (reasoning that the fact the defendant's motor home was licensed indicated it was "subject to

extensive regulation and inspection," thus justifying application of the automobile exception). For these reasons, the automobile exception applies under the circumstances of this case.

### Probable Cause to Search

The Court concludes that, by the time Trooper Parr conducted the full search of the Sport Trac at the mechanic's shop, he had probable cause to justify doing so. Probable cause permits a search under the automobile exception when "based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006). Courts determine whether probable cause exists based on common sense and the totality of the circumstances. *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014). The fair-probability standard does not require absolute certainty that contraband or evidence will be discovered during a search. *See Illinois v. Gates*, 462 U.S. 213, 231–32 (1983); *United States v. Preciado*, No. 17-cr-150 (SRN/FLN), 2018 WL 3104252, at *4 (D. Minn. Feb. 12, 2018), *R&R adopted*, No. 17-cr-150 (SRN/FLN), 2018 WL 1634419 (D. Minn. Apr. 5, 2018) (same). Instead, "[p]robable cause requires only a probability or substantial chance of criminal activity," *United States v. Newman*, 183 F.3d 753, 756 (8th Cir. 1999), and "law enforcement officers may draw inferences based upon their experience," *Cortez-Palomino*, 438 F.3d at 913.

Because the automobile exception applies, the Court looks to the totality of the circumstances known to law enforcement to discern whether they had probable cause to completely search the Sport Trac at the mechanic's office. Prior to the canine alert, Trooper Parr was aware of a several potentially incriminating facts that helped establish probable cause. He was concerned that an older model, high-mileage vehicle was being shipped across the country

for a cost that was very close to the value of the Sport Trac itself.[16] He knew, based on both his training and experience, that the Sport Trac is uniquely well-suited to drug trafficking given that it could easily be modified with hidden compartments. He was suspicious about the legitimacy of the license plates, given that the 528 plate had been placed on the vehicle after it had been registered with the 8P8 plate that he would have expected to be newer. The presence of multiple air fresheners and a powerful deodorizer in the cabin were consistent with drug trafficking as he knew that smugglers will use such items to mask the smell of contraband. Trooper Parr also heard a thud when he performed an echo test on the spare tire, indicating that a foreign substance was loaded inside the tire.[17] And when he went into the cabin he saw only a few tools, paneling and plastic that looked like they had been removed and replaced, a back seat that had been altered to prevent it from folding forward, and tool markings and lubricant on the rear seat's bolts suggesting that they had been removed several times. From these observations, he drew the inference that there was contraband in the spare tire and possibly in a hidden compartment behind the seat.

---

[16]    Although the defendants question Trooper Parr's credibility regarding the value of the Sport Trac, the Court finds his testimony on the subject to be both credible and probative. Though Trooper Parr could not remember the exact details he plugged into the KBB website when attempting to get an estimate, he recalled that he selected options for the make, model, and year of the vehicle and indicated it had high mileage and was in poor condition. All of these details regarding the Sport Trac support the reasonableness of the estimate of the car's value and are uncontroverted in the record. The fact that an investigator for the defense testified credibly that his investigation revealed a higher potential value of the vehicle does not render the Trooper's quick assessment of the value during his roadside inquiry invalid or unbelievable.

[17]    The defendants argue that Trooper Parr's testimony concerning the testing of the tires is questionable because of his mistaken recollection about the results of the density-meter testing. Trooper Parr reasonably explained why his report does not mention the density-meter results from February 17th. He explained that he mistakenly mixed up density-meter results from a subsequent methamphetamine investigation with this case when he responded to inquiries from the government's counsel prior to the April 29, 2019 evidentiary hearing. The Court finds Trooper Parr's testimony was credible.

However, Trooper Parr obtained additional information to confirm his suspicions before he conducted the search that ultimately located methamphetamine hidden in the Sport Trac. When the car hauler arrived in Bucklin for the canine sniff, Diego's handler led him around the Sport Trac while it was on the trailer. Diego alerted to the presence of drugs. Trooper Parr asked V.C. to drive the Sport Trac off the trailer, and Diego's handler walked him around the vehicle again. Diego alerted to the presence of drugs twice: near the back wall of the interior cabin; and again, near the spare tire underneath the pickup bed in the rear. These were precisely the locations that Trooper Parr suspected contraband was concealed. Trooper Parr's observations from before he looked inside the Sport Trac's cabin, after the limited search he performed pursuant to V.C.'s valid consent, and following Diego's positive alert all combined to create a fair probability that contraband or evidence of drug trafficking would be found in the Sport Trac.

Mr. Sierra-Serrano challenges the reliability of Diego's alert and of the reliance Trooper Parr placed upon the dog. (*See* Sierra-Serrano Mem. at 4, 28.) The evidence at the hearing indicated that Deputy Davis, who was Diego's handler, was experienced, that Diego was trained in drug detection, that Diego was a "street authorized dog for conducting drug operations," and Diego had been trained through the Ford County Sheriff's Department. Diego was only later certified by a national organization. Though this record may leave unanswered some questions regarding Diego's reliability, neither his relative inexperience nor his lack of national certification is fatal to a determination of probable cause. First, based on all the facts surrounding Diego's alerts, a reasonable person could conclude that they establish a fair probability that contraband or evidence of drug trafficking would be found in the Sport Trac. *See Florida v. Harris*, 569 U.S. 237, 248 (2013) ("The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of

common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."); *United States v. Jackson*, 811 F.3d 1049, 1051 (8th Cir. 2016) (finding that a dog's positive alert in "her first field operation" provided probable cause to search the defendant's aircraft). But even more importantly, Trooper Parr was rightly evaluating Diego's alerts in combination with many other facts that reasonably gave rise to his suspicions. Taken altogether, these facts readily provided probable cause.

For all these reasons, the Court concludes that the search of the Sport Trac on February 17, 2019 was lawful, and the defendants' motions to suppress the methamphetamine and other evidence found inside the vehicle should be denied.

## III.    Mr. Sierra-Serrano's Challenge to the Hennepin County Search Warrant

Mr. Sierra-Serrano seeks suppression of evidence taken from the cellular phones found inside the Sport Trac on February 19, 2019, which were searched pursuant to the execution of the Hennepin County search warrant signed by Judge Peterson. (ECF No. 65 at 2 ¶ 2.) For the reasons that follow, the Court recommends that Mr. Sierra-Serrano's motion be denied.

### A.  The Application and Warrant

Bloomington Police Officer Nicholas Melser, who was assigned as a Task Force Officer with the DEA, applied for the February 19, 2019 search warrant. In the statement of probable cause, Officer Melser indicates that he has assisted in several drug-trafficking investigations, arrests, and follow-up investigations. He indicates that he is familiar with the "day to day operation of narcotic trafficking organizations, including the importation and distribution methods utilizes, as well as the means used to avoid detection and apprehension by law enforcement." (Gov't Ex. 5 at 2.) Officer Melser indicates that he has had extensive training

regarding drug trafficking, but his affidavit does not specifically state anything he has learned about the use of cell phones by those engaged in drug trafficking crimes.

Officer Melser's affidavit continues, describing the events of February 17, 2019, and Trooper Parr's investigation. He indicates that Trooper Parr stopped the car hauler to conduct a CVSA inspection and noticed the Sport Trac. Trooper Parr received consent to search the Sport Trac and "found indicators of a possible post manufactured compartment behind the rear seat." (Gov't Ex. 5 at 3.) Officer Melser explains that V.C. then consented to bring the vehicle to Bucklin where a canine unit "was available for further confirmation." (*Id.*) The affidavit recounts the positive alerts by Diego and states that "[a] subsequent search of the vehicle led to the discovery of approximately 40 pounds of crystal methamphetamine located in a post manufactured compartment behind the backseat and in the spare tire." (*Id.*)

Officer Melser further states that V.C.[18] agreed to assist with a controlled delivery of the vehicle to "Ana Garcia" in Minneapolis, though it was unclear whether Ana Garcia was a real name or pseudonym. Law enforcement replaced the methamphetamine with a simulated substances and replaced it in the vehicle's hiding places. They also equipped the vehicle with surveillance equipment based on a search warrant. The surveillance equipment would notify the officers when the Sport Trac was moved and the simulated methamphetamine was accessed.

When the controlled delivery took place, the officers observed a male and a female driving a black Dodge Avenger with no plates pick up the Sport Trac. The officers followed the Sport Trac to 2632 30th Avenue South in Minneapolis, and saw the male and female enter the southern most door of the residence. Officers then saw two individuals come out to the vehicle

---

[18]    The affidavit identifies the car hauler's driver as "V.A.S."

and access the spare tire where the simulated substance was located and bring the tire into the same southern most door of the building. (Gov't Ex. 5 at 3–4.)

> Based on these facts, Officer Melser requested a search warrant for the following:

> Premise: 2632 30th Avenue S. southern most door and any associated storage lockers and garages
> Person(s) - Any person associated with the pick up, delivery or possession of white 2004 For Explorer Sport Trac - California registration 52804W1
> Vehicle - White Ford Explorer Sport Trac - California registration 52804W1[.]

(Gov't Ex. 5 at 4.) In the application, Officer Melser also stated that he believed that the following was among the property or things that would be at the premises to be searched:

> devices, or media used to store data by electronic or photographic means and the data stored therein. Cellular telephones, computer hard drives and storage devices and all associate peripherals and the stored data therein that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of hardware for evidence described, if, the officers executing the search warrant conclude it would be impractical to search the electronic hardware/computer on-site for evidence.

(Gov't Ex. 5 at 1.)

As noted above, on February 19, 2019, Judge Peterson signed the search warrant. (Gov't Ex. 5 at 8.) During the execution of the warrant, officers seized a gold colored Apple iPhone and a black colored Samsung Smart phone from the Sport Trac. (ECF No. 65 at 2¶ 2.) The data on those phones was searched on February 28, 2019. (*Id.*)

### B. Discussion

Mr. Sierra-Serrano argues that: (1) the warrant fails to satisfy the Fourth Amendment's particularity requirement; the supporting affidavit does not establish probable cause because there is no nexus between the cellular phones and any criminal activity; the good-faith exception to the exclusionary rule does not apply under these circumstances; and he did not consent to the search of the telephones. (Sierra-Serrano Mem. at 28–44.)

### *Particularity*

The Fourth Amendment provides that "no Warrants shall issue ... [unless] particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. This particularity requirement exists to prevent "a general, exploratory rummaging in a person's belongings" because "[g]eneral warrants ... are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *see also United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008)).

Courts judge compliance with the particularity requirement according to "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted). "The fourth amendment requires that a search warrant's description of the evidence to be seized be 'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized.'" *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (quoting *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir.1978)). How specific a warrant must be varies "depending on the circumstances and the type of items involved." *Frederickson*, 846 F.3d at 519 (internal quotations omitted). As such, courts do not resolve issues concerning particularity "in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (internal quotation marks omitted).

Taking into consideration the practical accuracy required rather than a hypertechnical standard, the Court concludes that the search warrant described the items to be seized with sufficient particularity to allow the officers executing it to ascertain and identify the places that could be searched and the cellular phones that could be seized. The search warrant clearly

authorized the search of the Sport Trac, listing it among the "premises" that could be searched. (Gov't Ex. 5 at 6.) It further described the list of items that could be seized and searched, including "[c]ellular telephones ... and the stored data therein that are believed to contain some or all of the evidence described in the warrant ..." (*Id.*) This description is sufficiently particular that officers executing the warrant could reasonably identify cellular telephones inside the Sport Trac and the relevant data on the phone as items they were authorized to seize and examine under the search warrant.

Mr. Sierra-Serrano relies on *In re Grand Jury Proceedings*, 716 F.2d 493 (8th Cir. 1983), to support his particularity argument, but this reliance is mispalced. In *In re Grand Jury Proceedings*, the court found a warrant lacking in particularity where it permitted officers to obtain all of the records of a bail bonding business despite the fact that the search warrant application made out a showing of probable cause that would have justified a much narrower scope. *See id.* at 497–98 (explaining that the affidavit only set forth probable cause that the bail bondsman's business had defrauded two surety companies he represented). The search warrant here, authorizing the examination of data on any cellular phones found in a methamphetamine load car, does not suffer from the same overbreadth problem identified in *In re Grand Jury Proceedings*. Cellular phones found inside the Sport Trac are closely tethered to a drug-trafficking operation in a way that every file a business possesses is not linked to a less expansive criminal scheme. Indeed, here, the phones were placed in the car during a brief trip, the entire purpose of which appears to have been transporting drugs. Such a tight connection between the crime being investigated and the place to be searched is strong support for probable cause.

Mr. Sierra-Serrano also suggests that this case is like *United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015), but the Court disagrees. In *Winn*, officers were investigating a report that Mr. Winn had photographed or videotaped underaged girls without their permission at a pool. He consented to the police taking possession of his phone, and they later sought a search warrant for the phone, including authorizing them to review any and all of the files on it. 79 F. Supp. 3d at 909–11. The district court found the search warrant was overbroad and lacked particularity because it exceeded the probable cause that supported its issuance. *Id.* at 919. The court reasoned that there was no basis to believe that all of the files on the phone would provide evidence of the crime that was being investigated, and found the warrant should have been limited to photos or videos. *Id.* at 919–20. But unlike *Winn*, the search warrant in this case authorized the review of the data stored on the phone that officers believed would "contain some or all of the evidence described [elsewhere] in the warrant." (Gov't Ex. 5 at 6.) This includes evidence that would show "constructive possession of contraband," "records ... to show a continued enterprise of the distribution of controlled substances," documents that could establish ownership, residency, and possession, and "records tending to indicate controlled substance trafficking …." (Gov't Ex. 5 at 6.) A variety of data stored on a modern cellular phone could fall within this list, but that does not mean that, given the particular circumstances of this case, the list is so overbroad as to authorize a general rummaging or insufficiently particular so that the officers did not know what they could search.

### Probable Cause

Mr. Sierra-Serrano argues that Officer Melser's application for the search warrant fails to establish a sufficient nexus between any cellular phones and criminal activity for there to probable cause supporting the search of these devices. (Sierra-Serrano Mem. at 36.) A search

warrant affidavit establishes probable cause "when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Skoda*, 705 F.3d 834, 838 (8th Cir. 2013) (quotation marks omitted). "A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." *United States v. Skarda*, 845 F.3d 370 (8th Cir. 2016) (quotation marks omitted) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). When reviewing a search warrant to determine whether it establishes probable cause, federal courts show deference to the issuing judge's probable-cause determination and ask whether the issuing judge had a "substantial basis to conclude that probable cause existed." *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir. 1991).

Here, the Court concludes that, although the affidavit perhaps ought to have been more specific regarding the suspected involvement of cell phones in the trafficking operations, based on all the information in Officer Melser's affidavit, the issuing judge had a substantial basis for concluding both that probable cause existed and that there is a sufficient nexus between cellular phones found inside the Sport Trac and the suspected criminal activity. The affidavit describes the discovery of 40 pounds of methamphetamine inside the Sport Trac by Trooper Parr; the installation of lookalike methamphetamine packages in the spare tire and hidden compartment; the use of tracking devices that would allow officers to see when and where the vehicle moved and if the packages were accessed; a controlled delivery of the vehicle that was under law enforcement surveillance; officers' observations that a male and female arrived together to retrieve the vehicle and then drove the Sport Trac to a residence in Minneapolis where they entered a south door; and additional observations that suspects from inside that residence quickly removed the spare tire and brought it inside the residence. These facts would permit a reasonable person to conclude there was a fair probability that the Sport Trac was being shipped across

country as a methamphetamine load car and that a search of the residence and the car that were under surveillance would reveal evidence of criminal activity.

Although Mr. Sierra-Serrano identifies an area of concern with respect to the nexus between cellular phones and the suspected criminal activity, there was still a substantial basis for the issuing judge to determine that probable cause existed. Certainly, the warrant application would have been stronger had it connected cellular phones to drug trafficking generally and included some statements regarding the likelihood that the phones would contain evidence of the suspected crime. But it was not unreasonable for the issuing judge to infer that cell phones found inside a vehicle that had just minutes before been used to ship forty pounds of methamphetamine across the country would be likely to reveal such evidence. Given the deferential standard applied in reviewing a warrant, the Court concludes that the probable-cause requirement was satisfied by the Hennepin County search warrant.[19] In light of this conclusion, the Court need not reach the parties' arguments concerning Mr. Sierra-Serrano's alleged consent to the search of any cellular phones.

## IV.    Mr. Castillo's Challenge to the Federal Cell Phone Warrant

Finally, the Court concludes that Mr. Castillo's motion to suppress the evidence obtained pursuant to the March 18, 2019 federal search warrant signed by this Court should be denied. The warrant authorized the search of three cell phones found inside the Dodge Avenger on February 19, 2019. Mr. Castillo requested a four-corners review of the warrant, claiming that it failed to establish probable cause. (ECF No. 47.) However, in his post-hearing briefing Mr. Castillo clarified his position, asserting that "[i]f the court concludes the search of the Ford

---

[19]    Even if the search warrant were somehow flawed, the evidence obtained by law enforcement would be admissible under the good-faith exception to the exclusionary rule. *United States v. Leon*, 486 U.S. 897 (1984).

Explorer was invalid, then those facts should be disregarded and the search warrant invalidated

for lack of probable cause." (Castillo Mem. at 1 n.2.) Because the Court has concluded that the

search of the Sport Trac did not violate the defendants' Fourth Amendment rights, and

Mr. Castillo has presented no other argument concerning the validity of the federal search

warrant, it was unnecessary for this Court to refer the matter to another magistrate judge and his

motion should be denied.

## V.    Recommendation

For the reasons discussed above, the Court makes the following recommendations.

1.    Mr. Castillo's Motion to Suppress Physical Evidence **(ECF No. 47)** should be

**DENIED**.

2.    Ms. Alatorre's Motion to Suppress Search and Seizure **(ECF No. 56)** should be

**DENIED**.

3.    Mr. Sierra-Serrano's Motion to Suppress Evidence Obtained as a Result of Search

and Seizure **(ECF No. 65)** should be **DENIED**.


Date: July 22, 2019                            *s/Katherine Menendez*
                                               Katherine Menendez
                                               United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a
magistrate judge's proposed finding and recommendations within 14 days after being served a
copy" of the Report and Recommendation. A party may respond to those objections within 14
days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses
must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.